**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| D. JACKSON MILHOLLAN, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 23-59 |
| LIVE VENTURES INCORPORATED, | ) | Judge Nora Barry Fischer |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 1997 IRREVOCABLE TRUST FOR THE MCALLEN FAMILY, et al., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      INTRODUCTION

This case involves dueling breach of contract and fraud/fraudulent inducement claims arising out of a merger between Defendant/Counterclaimant Live Ventures, Inc. ("Live") and Precision Industries, Inc. ("Precision").  Plaintiff D. Jackson Milhollan ("Milhollan"), in his capacity as the representative of the former shareholders of Precision, brings a breach of contract claim against Live.  (Docket No. 27).  In turn, Live brings individual fraud and fraudulent inducement counterclaims against Milhollan and each of Precision's former shareholders.  (Docket No. 28).  Presently before the Court is a Motion to Dismiss brought by most of the Counterclaim Defendants ("Shareholders")[1] pursuant to Federal Rules of Civil Procedure 12(b)(6) and Live's

---

[1]      The moving Shareholders include: 1997 Irrevocable Trust for the McAnallen Family, A.P.S a minor by and through his parent Jacqueline Ann Milhollan, Teya Davis, Michael Davis, Jr., Adela Fisher, Shelby Hudson Hines, Allison Hudson, James J. Hudson, James F. Hudson, Trustee for James F. Hudson and Joan E. Hudson Revocable Trust, Colleen P. Johnson, Janet B. Klujka, R. Allen Koch, Mark Maxwell Trustee Declaration of Trust Dated August 18, 2005, Peter S. McAnallen, Robert S. McAnallen, II, Jacqueline Ann Milhollan, Nicole Milhollan, Payton Milhollan, Patricia Kurtz Marital Trust, Joseph Warco, and Amanda Westlund a/k/a Amanda Mayer.  (Docket Nos.

opposition thereto.  (Docket Nos. 45; 56).  The motion has been briefed and the parties have not requested oral argument.  (Docket Nos. 46; 56; 62).  After careful consideration of the parties' arguments, and for the following reasons, the Shareholders' Motion to Dismiss will be granted.

## II.    FACTUAL BACKGROUND

The following facts come from Milhollan's Second Amended Complaint, the Agreement and Plan of Merger dated July 14, 2020 attached thereto ("Agreement"), and Live's Answer.  (Docket Nos. 27; 28).  The Court assumes the factual allegations made in support of Live's counterclaims are true for purposes of the present motion.  *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).

### A.  *Live's Counterclaims: Underlying Events & Relevant Contractual Provisions*

On July 14, 2020, Live Ventures, a Nevada corporation, and Precision Industries, a Pennsylvania-based corporation entered into a Merger Agreement pursuant to which Live purchased the shares of Precision and Precision merged into Live.  (Def. Countercl.[2] at ¶¶ 7, 9).  Pursuant to § 6.10(a) of the Agreement, Precision's shareholders appointed D. Jackson Milhollan to be their representative and to act on their behalf in connection with the Agreement.  (*Agreement*[3] at § 6.10(a)).  In doing so, the shareholders—approximately twenty-six (26) different individuals and entities—authorized Milhollan to be their "lawful attorney in fact and agent[.]"  (*Id.*).

As part of the consideration promised by Live, the Agreement created an "Indemnity Holdback Amount" equal to $2,500,000 which Live would temporarily withhold "for the purposes of securing the obligations of the [s]hareholders for . . . any Loss for which [Live is] entitled to

---

45-46).

[2]    *See* Docket No. 28.  To limit potential confusion surrounding whether citations to Document Number 28 refer to Live's answers or counterclaims, the Court will cite its answers as "Docket No. 28" and its counterclaims as "Def. Countercl."

[3]    *See* Docket Nos. 27-1 and 45-1.  All citations to the Agreement refer to its original page numbers, rather than the numbering generated by ECF.

indemnification pursuant to Article 9." (*Id*. at §§ 1.1[4], 2.14, 9.1).  However, this "holdback period" would be in effect until January 31, 2022, at which time Live would—barring several contingencies related to any losses—release the then-remaining balance of the Holdback Amount to the Shareholders.  (*Id*. at § 9.6).  But, one such contingency provides that the shareholders will indemnify Live for losses arising out of "any inaccuracy in or breach of any of the representations or warranties of the Company contained in this Agreement or in any Company Document[.]"  (*Id*. at § 9.2(a); *see also* Def. Countercl. at ¶ 17).  Section § 9.1 provided Live until January 31, 2022 to assert in writing any claims arising from such inaccuracies or breaches.  (Def. Countercl. at ¶ 23).

Article 4 sets forth the Representations and Warranties Precision made to Live, three of which are at issue here.  (*Id*. at ¶ 13).  The first, § 4.6(a), addresses the financial information Precision provided to Live and whether these reports were prepared using generally accepted accounting principles ("GAAP"):

> [Precision] has furnished [Live] with complete copies of the Financial Statements.[5]  The Financial Statements (i) were prepared in accordance with GAAP, subject in the case of the Unaudited Balance Sheet[6] to (A) the absence of footnote disclosures (that, if presented, would not differ materially from those presented in the Audited Balance Sheet[7]) and (B) changes resulting from normal year-end adjustments (each of which would be immaterial

---

[4]     *See* Art. 1 at 8 ("Indemnity Holdback Amount").

[5]     *See* § 1.1 at 6 ("'<u>Financial Statements</u>' means (a) (i) the audited balance sheet of [Precision] as at December 31, 2019 (the Audited Balance Sheet") and the related audited statements of income, cash flows, statements of operations, and changes in equity of [Precision] for the year then ended together with the notes and schedules thereto and (ii) the audited balance sheet of [Precision] as at December 31, 2018 and the related audited statements of income, cash flows, statements of operations, and changes in equity of [Precision] for the year then ended together with the notes and schedules thereto, and (b) (i) the unaudited balance sheet of [Precision] (the "Unaudited Balance Sheet") as at March 31, 2020 and the related unaudited statements of income and cash flows of [Precision] for the three-month period then ended and (ii) the unaudited balance sheet of [Precision] as at March 31, 2019 and the related unaudited statements of income and cash flows of [Precision] for the three-month period then ended.").

[6]     *See id*. at 15 ("'<u>Unaudited Balance Sheet</u>' shall have the meaning as set forth in the definition of Financial Statements.").

[7]     *See id*. at 2 ("'<u>Audited Balance Sheet</u>" shall have the meaning set forth in the definition of Financial Statements.").

> individually and in the aggregate to the Unaudited Balance Sheet)
> and (ii) present fairly in all material respects the financial condition
> and results of operations of [Precision] as of the times and for the
> periods referred to therein. [Precision] maintains a standard system
> of accounting established and administered in accordance with
> GAAP.

(*Agreement* at § 4.6(a)). Second, § 4.6(c) states: "The cost of inventory reflected on the books and

records of [Precision] is calculated in accordance with the historical practices of [Precision] that

were used in calculating the inventory set forth in the Audited Balance Sheet and the Unaudited

Balance Sheet." (*Id*. at § 4.6(c)). Lastly, § 4.14(g) provides:

> Except as set forth in <u>Section 4.14(g)</u> of the Disclosure Schedules
> and other than as required under Sections 601 to 608 of ERISA or
> other applicable Law, no Company Plan provides post-termination
> or retiree health benefits to any individual for any reason, and
> neither [Precision] nor any of its ERISA Affiliates has any liability
> or obligation to provide post-termination or retiree health benefits to
> any individual.

(*Id*. at § 4.14(g)). The final provision relevant to Live's counterclaims is Schedule 1.1(a), which

states "that 'Indemnified Litigation' that occurs post-closing may be claimed against the holdback

amount." (Def. Countercl. at ¶ 22).

Under Live's interpretation of § 4.6(a), because Precision represented and warranted that

its Financial Statements were "prepared according to GAAP," then "any component part thereof,

including inventory, was likewise required to be GAAP compliant." (*Id*. at ¶ 14). Live

acknowledges that Precision represented and warranted that the cost of inventory was calculated

in accordance with its "historical practices," but it points out that those "practices" were also used

to calculate the inventory in the Audited Balance Sheet and the Unaudited Balance Sheet. (*Id*. at

¶ 15). To that end, by referencing the Definitions in the Agreement, Live interprets "Financial

Statements" to encompass the Audited and Unaudited Balance Sheets and therefore posits that

they were likewise required to be GAAP-compliant. (*Id*. at ¶¶ 13, 18). Live further alleges that

inventory must also be GAAP-compliant because it is a line item in both Balance Sheets. (*Id*. at ¶¶ 19, 20).

Live claims that when it analyzed Precision's books and records in the ordinary course of business before January 31, 2022, it found irregularities totaling over $4,700,000. (*Id*. at ¶¶ 24, 25). Specifically, Live alleges:

- Precision's inventory valuation was overstated by approximately $3.3 million.
- Precision purchased $782,531.43 of inventory from Industeel, which was "out of specification, useless and effectively valueless." Shareholders accepted a $536,325.35 settlement amount from Industeel and "claimed the remaining worthless inventory in its Original Net Working Capital calculation, which [was] an overstatement[.]"
- Obsolete inventory was inflated, rather than listed at liquidation valuation.
- Post-termination employee benefits of a former Precision employee had not been previously disclosed.
- Legal fees related to the Corso case accrued post-closing.

(*Id*. at ¶ 25(a)-(e)). On January 31, 2022, Live sent written notification of the above and retained the $2,500,000 Indemnity Holdback Amount. (*Id*. at ¶¶ 26-27). Live believes that these accounting irregularities amounted to breaches of the representations and warranties regarding Precision's GAAP-compliant inventory, absence of post-termination employee benefits liabilities, and post-closing legal fees. (*Id*.). Live further claims that the Shareholders "have refused to pay the difference of the approximately $2,000,000 [Live] incurred due to their misrepresentations." (*Id*. at ¶¶ 27, 28).

### B. Other Relevant Provisions in the Agreement

There are several other provisions in the Agreement relevant to the Court's analysis, beginning with the parties' choice of law clause in Article 11:

> Governing Law. This Agreement and the Transaction Documents and all claims or causes of action (whether in contract or tort) that

> may be based upon, arise out of or relate to this Agreement and/or the Transaction Documents or the negotiation, execution, performance of this Agreement and/or Transaction Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement and/or Transaction Documents), shall be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to the conflict of laws principles thereof that might require the application of the Laws of another jurisdiction.

(*Id*. at § 11.11).  The subsequent section specifies that "[a]ll claims, actions and proceedings (whether in contract or tort) based upon, arising out of or relating to this Agreement . . . shall be heard and determined exclusively in the Court of Chancery of Delaware in the State of Delaware[.]"  (*Id*. at § 11.12).

Further, there are notable provisions concerning the Shareholders' representations, the scope of Milhollan's power, and indemnification.  Starting with a brief revisit to the section concerning Precision's representations and warranties to Live, Article 4, where an integration clause is found in the final section:

> No Other Representations or Warranties.  Except for the representations and warranties contained in this Article 4 . . . none of [Precision], Shareholders or any of its or their Representatives has made or makes any other express or implied representation or warranty, whether written or oral, on behalf of [Precision] or any of its Affiliates, Shareholders or Representatives, including with respect to (a) any estimates, projections, forecasts, plans, budget or prospect information relating to the business of [Precision] (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans, budgets or prospect information) or (b) except for the representations and warranties contained in this Article 4 . . . any oral or written information presented to [Live] or any of its Affiliates or Representatives in the course of their due diligence of [Precision], the business of [Precision], the negotiation of this Agreement, the Transaction Documents, or in the course of the transactions contemplated hereby and thereby.

(*Id*. at § 4.22).  Similarly, in Article 5, which contains Live's representations and warranties to

Precision, the contours of Live's reliance are outlined as follows:

> <u>Reliance</u>. Each of [Live] and Merger Sub acknowledges that it and
> its Representatives have been permitted full and complete access to
> the books and records, facilities, equipment, Tax Returns, contracts,
> insurance policies (or summaries thereof) and other properties and
> assets of [Precision] that they and their respective Representatives
> have desired or requested to see or review, and that they and their
> respective Representatives have had a full opportunity to meet with
> the officers and employees of [Precision] to discuss the business of
> [Precision]. Each of [Live] and Merger Sub acknowledges that
> neither [Precision] nor any other Person has made any
> representation or warranty, express or implied, as to the accuracy or
> completeness of any information that [Precision] furnished or made
> available to [Live] or Merger Sub and their respective
> Representatives, except for representations and warranties by
> [Precision] expressly set forth in <u>Article 4</u>. . . . Each of [Live] and
> Merger Sub acknowledges that, except for the representations and
> warranties of [Precision] contained in <u>Article 4</u> . . . neither
> [Precision] nor any other Person has made, and neither [Live] nor
> Merger Sub has relied on, any other express or implied
> representation or warranty by or on behalf of, or with respect to,
> [Precision].

(*Id*. at § 5.10).

Turning next to Milhollan, whose appointment as the "Shareholders' Representative"
conferred upon him the power to "agree to, negotiate, litigate, arbitrate, resolve, settle and
compromise, and comply with orders of courts with respect to, claims for indemnification made
by any Parent Indemnitee pursuant to Article 9[.]"  (*Id*. at § 6.10(a)(iv)).  And, within the same
provision detailing Milhollan's duties, it states:

> Following the closing, [Live] shall be entitled to deal exclusively
> with the Shareholders' Representative on all matters relating to this
> Agreement (including with respect to . . . <u>Article 9</u>) and [Live],
> [Precision] and any other person may conclusively and absolutely
> rely, without inquiry, upon any action of the Shareholders'
> Representative in all matters referred to herein, in each case as being
> fully binding upon the Shareholders.  Any decision or action by the
> Shareholders' Representative hereunder, including any agreement
> between the Shareholders' Representative and [Live] relating to the
> defense, payment or settlement of any claims for indemnification

hereunder, shall constitute a decision or action of all Shareholders and shall be final, binding and conclusive upon each such Person.

(*Id*. at § 6.10(a)).  Next, Article 9 governs "Indemnification" and § 9.4 applies certain limitations to the Shareholders' liability:

> The Shareholders shall not be liable to the [Live] Indemnitees[8] for indemnification under Section 9.2(a) until the aggregate amount of all Losses in respect of indemnification under Section 9.2(a) exceeds $240,000 (the "Deductible"), in which event the Shareholders shall be liable for all such Losses in excess of the Deductible, and (ii) the aggregate amount of all Losses for which the Shareholders shall be liable for indemnification under Section 9.2(a) . . . shall not exceed the Indemnity Holdback Amount; provided, however, that neither Section 9.4(a)(i) nor Section 9.4(a)(ii) shall apply to Losses arising out of . . . (B) actual fraud of [Precision].

(*Id*. at § 9.4(a)(i)).  Another provision within Article 9 acknowledges the indemnification provisions therein as the parties' "Exclusive Remedies" and states, in relevant part, as follows:

> Except as provided in Section 11.14, each party acknowledges and agrees that, following the Closing, its sole and exclusive remedy with respect to any and all claims relating to the subject matter of this Agreement and the transactions contemplated hereby shall be pursuant to the indemnification provisions set forth in this Article 9 . . . . In furtherance of the foregoing, but without limiting or otherwise affecting in any respect the rights of indemnification expressly provided for under this Article 9 . . . each party hereby waives, to the fullest extent permitted under Law and except as provided in Section 11.14, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law and following the Closing.  Notwithstanding anything to the contrary in this Article 9 or elsewhere in this Agreement, nothing in this Article 9 or elsewhere in this Agreement shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled

---

[8]      *See Agreement* at §1.1 ("'Parent Indemnitees' has the meaning set forth in Section 9.2"); *see also id*. at § 9.2 ("[T]he Shareholders, severally and not jointly (in accordance with their Pro Rata Shares), shall indemnify and defend each of [Live] and its Affiliates (including the Surviving Corporation) and their respective Representatives (collectively, the 'Parent Indemnitees') . . . .").  For convenience, the Court will continue to substitute "Live" for "Parent" when quoting "Parent Indemnitees" in the Agreement.

or to seek and obtain any remedy for actual fraud.

(*Id*. at § 9.8).  Finally, the Agreement includes an integration clause in Article 11:

> <u>Entire Agreement</u>.  This Agreement, including the Disclosure Schedules and Exhibits attached hereto and which are deemed for all purposes to be part of this Agreement, the Transaction Documents and the Confidentiality Agreement, contain all of the terms, conditions and representations and warranties agreed upon or made by the parties relating to the subject matter of this Agreement and the business and operations of [Precision] and supersede all prior contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties or their Representatives, oral or written, respecting such subject matter.  No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement or any of the Transaction Documents has been made or relied upon by any of the parties.  The parties have voluntarily agreed to define their rights, liabilities and obligations respecting the subject matter hereof exclusively in contract pursuant to the express terms and provisions of this Agreement and the parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement or any Transaction Document.  Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; the parties specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of ordinary parties in an arm's-length transaction.

(*Id*. at § 11.3).

## III.    PROCEDURAL HISTORY

Per the Agreement's forum selection clause, Milhollan initially brought this action in the Court of Chancery of Delaware, but the Chancery Court dismissed his complaint for lack of subject matter jurisdiction because he did not raise any equitable claims.  *See Milhollan v. Live Ventures, Inc*., No. 2022-0915-PAF, 2023 WL 2943237, at *3 (Del. Ch. Apr. 13, 2023).  Thus, Milhollan brought the lawsuit in this Court on January 12, 2023.  (Docket No. 1).

Live then moved to dismiss Milhollan's Complaint for failure to state a claim.  (Docket Nos.

10-11).  The Court subsequently ordered the parties to show cause why this action should not be dismissed for failure to sufficiently plead diversity jurisdiction as the Complaint did not identify the individual shareholders, nor each of the shareholders' state of citizenship.  (Docket No. 14). In response, the parties listed each shareholders' state of citizenship and advised that Milhollan intended to amend his Complaint to name all real parties in interest.  (Docket No. 15).  With the caveat that it expected factual support for each allegation of citizenship, the Court granted Milhollan leave to amend and denied Live's Motion to Dismiss, without prejudice.  (Docket No. 18).

Accordingly, Milhollan filed his Amended Complaint with the requisite information on July 24, 2023.  (Docket No. 19).  Live answered with counterclaims on August 7, 2023.  (Docket No. 20).  Milhollan subsequently moved to strike his Amended Complaint and Live's Answer to clarify that the shareholders are not pursuing this action individually and that he did not intend to join them as parties.  (Docket No. 23).  Despite Live's opposition thereto, the Court granted Milhollan's Motion and granted him leave to submit a Second Amended Complaint, which he filed on October 12, 2023.  (Docket Nos. 25-27).  Live answered and asserted its counterclaims against Milhollan and the individual shareholders on October 26, 2023.[9]  (Docket No. 28).  The Shareholders challenged Live's counterclaims by filing this Motion to Dismiss and supporting brief on January 16, 2024.  (Docket No. 45-46).  Thereafter, on February 13, 2024, Live responded with a brief in

---

[9]        Although Live alleges that the Shareholders are required parties under Fed. R. Civ. P. 19(a)(1)(A) in its Brief in Opposition to Milhollan's Motion to Strike, (Docket No. 25), and suggests the same in its Answer and counterclaims, (Def. Countercl. at ¶ 6), the Court makes no determination regarding the applicability of Rule 19(a)(1) because it grants dismissal under Rule 12.  Inasmuch as Live's joinder of non-parties is concerned, the Court proceeds on the narrow basis that diversity jurisdiction has not been destroyed and such joinder is possible under Fed. R. Civ. P. 13(h).  *See Moxie Ate LP v. Bostwick Design P'ship*, No. 1:21-cv-167, 2022 WL 4120626, at *4 (W.D. Pa. Sept. 9, 2022) (collecting cases).  But, the Court "declines to delve into any further joinder analysis" because Live's counterclaims are "conclusory to such an extent that the Court finds it necessary to dismiss the claim[s] without prejudice before adjudicating whether joinder of Counterclaim-Defendants is appropriate."  *HP Ingredients Corp. v. Sabinsa Corp.*, No. 21-16800, 2023 WL 1929953, at *2 (D.N.J. Feb. 10, 2023); *see also* n.5 (reserving for judgment, *inter alia*, whether joinder is allowed under Rule 19 or Rule 20).

opposition.  (Docket No. 56).  The Shareholders replied on March 5, 2024.  (Docket No. 62).  As the Shareholders' motion has been fully briefed, it is now ripe for disposition.

## IV.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain enough facts to state a claim to relief that is plausible on its face." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Plausibility exists somewhere between "possible" and "probable."  The former necessitates factual allegations that are "more than merely consistent with a defendant's liability." *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).  But the latter only demands that the court be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1937 (citations omitted).  Detailed allegations are not necessary to survive a Rule 12(b)(6) motion to dismiss, however, the complaint must contain "more than labels and conclusions" or "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citations omitted).

In general, when a trial court evaluates a Rule 12(b)(6) motion to dismiss, it "may not consider matters extraneous to the pleadings." *Doe v. Princeton Univ*., 30 F.4th 335, 342 (3d Cir. 2022) (quoting *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997)).  However, courts may consider "any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pinkney v. Meadville, Pa.*, No. 21-1051, 2022 WL 1616972, at *2 (3d Cir. 2022) (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016)).

The United States Court of Appeals for the Third Circuit has instructed the district courts to

utilize a three-step process in evaluating a Rule 12(b)(6) motion to dismiss.  *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022).  Court must first set out the elements of the plaintiff's claim; then, identify and disregard any "formulaic recitation of the elements" or allegations that are "so threadbare or speculative" such that they amount to nothing more than mere conclusory statements; and, finally, evaluate "the plausibility of the remaining allegations" by assuming their veracity and "construing them in the light most favorable to the plaintiff[.]"  *Id.* at 327-328 (alteration, internal quotation marks, and citations omitted).  In addition, courts must draw all reasonable inferences in favor of the plaintiff.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-791 (3d Cir. 2016).

## V.     DISCUSSION

The Shareholders move to dismiss Live's counterclaims for fraud and fraudulent inducement for failure to state a claim upon which relief may be granted.  (Docket Nos. 45-46).  Live counters that it has met the federal and state pleading standards and that the case should be permitted to move beyond the pleadings and into the discovery phase.  (Docket No. 56).  While the parties make several arguments in support of their respective positions, the Court initially addresses their choice of law dispute and then focuses on the insufficiency of Live's claims with respect to the applicable pleading standards and the provisions set forth in the Agreement.  The Court's rationale follows.

### A.  *Choice of Law*

Before specifically addressing the parties' positions, the Court must first determine the appropriate state law to apply to analyze the claims in relation to the Agreement.  At the outset, "[a] federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state."  *Echols v. Pelullo*, 377 F.3d 272, 275 (3d Cir. 2004) (citing *Klaxon Co. v. Stentor Electric*

*Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).  Therefore, this Court must apply Pennsylvania choice of law rules.

To that end, "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  As a signatory to the Agreement, Live agreed that "all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to [the] Agreement . . . shall be governed by . . . the internal Laws of the State of Delaware[.]" (*Agreement* at § 11.11.).  Therefore, Delaware law should apply to evaluate the plausibility of Live's claims.  (*Id*.).  While the Court recognizes that the individual Shareholders are non-signatories, it need not determine whether the choice of law provision applies to them because when "the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." *Berg Chilling Sys., Inc. v. Hull Corp*., 435 F.3d 455, 462 (3d Cir. 2006).  As discussed below, Pennsylvania law does not yield a different outcome.

### B.  *Live's Counterclaims: Fraud and Fraudulent Inducement*

Live alleges that the Court cannot accord complete relief if the individual shareholders are not parties in this matter because the Shareholders *themselves* are liable for any losses arising out of actual fraud; as such, it could not be made whole should it prevail here.  (Docket No. 56 at 5).  As for the specific claims against the Shareholders, Live alleges that the representations found in §§ 4.6(a) and (c) ("Financial Statements; No Undisclosed Liabilities; Inventory; PPP Loan."), § 4.14(g) ("Employee Benefit Plans."), and Schedule 1.1(a), amounted to fraud and fraudulent inducement.  (Def. Countercl. at ¶¶ 32-44).  According to Live, the Shareholders made these representations with the intent to induce it "into entering the Merger Agreement and paying an

inflated amount for Precision." (*Id.* at ¶ 36).  As a result, Live alleges that it paid an inflated amount to purchase Precision's shares and seeks approximately $4.5 million in damages—which justifies its retention of the Holdback Amount and entitles it to an additional $2,000,000 from the Shareholders.  (*Id.* at ¶¶ 27, 28, 31).  Hence, to complete the first step within the Third Circuit's three-step framework, the Court turns to the elements of fraud and fraudulent inducement under Delaware law.

### i.  Live Failed to Plead Fraud with Particularity

There are five elements a plaintiff must allege to state a claim for fraud in Delaware courts:

> (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.[10]

*Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc*., 269 A.3d 984, 988 (Del. 2021) (citing *Prairie Capital III, L.P. v. Double E Hldg. Corp*., 132 A.3d 35, 49 (Del. Ch. 2015)).  Similarly, to "establish fraud in the inducement . . . . [a plaintiff is] required to establish the elements of common law deceit, which include misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying."[11] *SPay, Inc. v. Stack Media Inc.*, No. 2020-0540, 2021 WL 1109181, at *3 (Del. Ch. Mar. 23, 2021) (alteration in original) (citation omitted).

---

[10]  *Cf. Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. 2005) ("The specific elements of fraud are as follows: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.").

[11]  Pennsylvania courts appear to use the same six elements outlined above for fraudulent inducement. *See Seguro Medico, LLC v. Humphreys*, No. 293 M.D. 2023, 2024 WL 1061549, at *8 (Pa. Commw. Ct. Jan. 3, 2024) (citing *SodexoMAGIC, LLC v. Drexel Univ*., 24 F.4th 183, 206 (3d Cir. 2022) ("The six elements of fraud apply . . . to fraudulent inducement . . . .")).

The starting place for either type of fraud is Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "a party must state with *particularity* the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (emphasis added).[12]  Meaning, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."[13] *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).  Further, the plaintiff "also must allege who made a misrepresentation to whom and the general content of the misrepresentation."[14] *Ne. Revenue Servs., LLC v. Maps Indeed, Inc.*, 685 F. App'x 96, 102 (3d Cir. 2017).  As for the defendant's intent and knowledge, Rule 9(b) provides that these circumstances "may be averred generally." Fed. R. Civ. P. 9(b).  In sum, a plaintiff alleging fraud must "place the defendant on notice of the precise misconduct with which [it is] charged." *Frederico*, 507 F.3d at 200 (quoting *Lum v. Bank of America,* 361 F.3d 217, 223–224 (3d Cir. 2004) (internal quotation marks omitted).

Live contends that the representations found in the Agreement regarding Precision's GAAP-compliant inventory and post-termination employee benefits liabilities, as well as the legal fees it incurred post-closing, were "made fraudulently with knowledge of their falsity and or with conscious disregard for their truth and accuracy." (Def. Countercl. at ¶ 34).  Live further alleges that the Shareholders represented that the inventory was GAAP complaint and failed to report liabilities related to a former employee's post-termination benefits to "induce [it] to enter into [the Agreement] and to do so at an inflated price." (*Id*. at ¶ 42).

However, this is the extent of the particularity with which Live describes the circumstances

---

[12]    *Cf.* Del. Ch. Ct. R. 9(b) ("[T]he circumstances constituting fraud . . . shall be stated with *particularity*.").

[13]    *Cf. Valley Joist*, 269 A.3d at 988. ("The factual circumstances . . . refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation.").

[14]    *Cf. Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (explaining that the plaintiff must provide sufficient detail "to apprise the defendant of the basis for the claim.").

constituting fraud.  (*Id*. at 8-13).  This Court will accept as true, as it must at this stage, Live's assertion that these representations were false; but Live provides little context past outlining the language in the Agreement, then briefly detailing Precision's accounting irregularities, before it concludes that these circumstances amounted to fraud.  (*Id*.).  Most glaringly, Live does not identify *any* misrepresentation in the Agreement made by an *individual Shareholder*—much less, specify any fundamental facts regarding its occurrence, *e.g.*, the date or location.  *See Frederico*, 507 F.3d at 200.  In practical terms, it is difficult to evaluate the plausibility of alleged misconduct when the wrongdoer's identity is unknown.  *See Ne. Revenue Servs.*, 685 F. App'x at 102.  Nor does Live specify *when* it discovered these irregularities during the 18 months following the Agreement's execution. (Def. Countercl. at ¶¶ 24-26).  Moreover, Live concludes that when these representations and warranties were made, the Shareholders knew that they were false.  (*Id*. at ¶ 34, 40).  In the absence of any meaningful details, this averment of knowledge is a "threadbare and speculative" allegation that is the type of "conclusory statement" which must be disregarded. *Lutz*, 49 F.4th at 327.

Even drawing all reasonable inferences in favor of Live, it has only *partially* stated the first element of fraud and fraudulent inducement inasmuch as it identified certain false misrepresentations.  *See Valley Joist*, 269 A.3d at 988; *see also Connelly*, 809 F.3d at 790.  The remaining elements—*i.e.*, the Shareholders' knowledge and intent, as well as the reasonableness or justifiability of Live's reliance—are plainly formulaic recitations and devoid of particularity. *See Lutz*, 49 F.4th at 327.

Overall, despite accepting the non-conclusory facts as true and viewing them in the light most favorable to Live, the counterclaims fail to allege enough facts to state facially plausible fraud and fraudulent inducement claims against the Shareholders.  *See Twombly*, 550 U.S. at 570.  Therefore,

Live *also* did not satisfy the heightened pleading standard under Rule 9(b) because it failed to state the circumstances constituting fraud with particularity and these deficiencies require dismissal. *See* Fed. R. Civ. P. 9(b).  Accordingly, Shareholders' Motion to Dismiss Counts I and II of Live's counterclaims will be granted and Live's claims of fraud and fraudulent inducement will be dismissed as to the Shareholders.

### ii.      The Agreement Precludes Live's Counterclaims

Although the Court's analysis could end here, there is another important deficiency precluding Live's theory of liability which alternatively justifies dismissal for failure to state a claim: the language in the Agreement.  In this regard, the fourth element of fraud, justifiable reliance on the misrepresentation, requires a party to "show that it is reasonably conceivable that his action was taken in justifiable reliance upon the representation[,]" which "is a contextual inquiry and is judged by reference to [his] knowledge and experience."  *Labyrinth, Inc. v. Urich*, No. 2023-0327, 2024 WL 295996, at *15 (Del. Ch. Jan. 26, 2024) (quoting *Arwood v. AW Site Servs., LLC*, No. 2019-0904, 2022 WL 705841, at *23 (Del. Ch. Mar. 9, 2022)) (internal quotation marks omitted).  The reasonableness of a party's reliance "depends on all of the circumstances" and is therefore "generally not suitable for resolution on a motion to dismiss[,]" except "for the legal conclusion that reliance was not reasonable because of a fully integrated contract's explicit anti-reliance representation."  *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, No. N14C-12-112, 2015 WL 5968726, at *7 (Del. Super. Ct. Sept. 25, 2015) (citations and internal quotation marks omitted).

Under Delaware law, courts will uphold "clauses that identify the specific information on which a party has relied and which foreclose reliance on other information."  *Prairie Cap.*, 132 A.3d at 50.  To that end, "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then

17

shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim." *Abry*, 891 A.2d at 1057.

Delaware courts will intervene to protect a silenced "innocent victim[,]" when "a relatively unsophisticated party[,]" or one "lacking bargaining clout who sign[ed] a contract with a boilerplate merger clause[,]" is involved. *Abry*, 891 A.2d at 1061 & at n.73 (collecting cases). However, Delaware courts respect "the ability of sophisticated businesses" to "make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability." *Id*. While there is a strong public policy against fraud, there is also a "need for commerce to proceed in a rational and certain way" and courts will not relieve "sophisticated business entities of the burden of freely negotiated contracts." *Id*. at 1061–62.

Here, Live claims that the Shareholders made the false representations, but the Agreement plainly states that the representations and warranties in Article 4 were made by the Company, *i.e.*, Precision. (*Agreement* at 29). Indeed, the Agreement's text is flatly contrary to Live's assertion of liability against the Shareholders; despite Live's attempt to replace "Company" with "[Shareholders]" when quoting or referencing the provisions in Article 4, the Shareholders and the Company are not interchangeable. (Def. Countercl. at ¶¶ 13, 21). The definitions in the Agreement include that "'<u>Shareholder</u>' means a holder of Company Common Stock" while "'<u>Company</u>' has the meaning set forth in the Preamble," *i.e.*, "Precision Industries, Inc., a Pennsylvania corporation[.]" (*Agreement* at 1; §1.1 at 3, 13). Thus, the plain language of the Agreement is clear that the Shareholders did not make the representations or warranties to Live set forth in Article 4. (*Id*.).

Moreover, Live cannot claim that it relied on a promise or representation from an individual

Shareholder which was outside of Article 4 or the Agreement because the integration clause at § 4.22 explicitly states that no such representations or warranties were made. *See Agreement* at § 4.22. Live also affirmatively disclaims its reliance on any such information in later provisions of the Agreement. *See id*. at § 5.10 ("[E]xcept for the representations and warranties of [Precision] contained in <u>Article 4</u> . . . neither [Precision] nor any other Person has made, and neither [Live] nor Merger Sub has relied on, any other express or implied representation or warranty by or on behalf of, or with respect to, [Precision]."). Read together, these terms identify the specific information Live relied on from Precision and they foreclose any claim that Live relied on any information from the Shareholders.

Live likewise acknowledged that the Agreement "embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations" in § 11.3, and the disclaimers therein are particularized and tailored to the underlying merger transaction. (*Agreement* at § 11.3). As sophisticated parties, Live and Precision made "[c]ontractually binding, written representations of fact[,]" which, "ought to be the most reliable of representations." *Abry*, 891 A.2d at 1057. Accordingly, the Court finds that Live may not rely on any extra-contractual representation from an individual Shareholder, nor can it bring a collective fraud claim against them for statements not expressly contained in the Agreement. Live expressly agreed to certain, limited remedies for post-merger recovery, which are set forth in Article 9 and specifically delineate the losses that would entitle Live to indemnification by the Shareholders. *See Agreement* at § 9.2. But, such indemnification is subject to limitations; namely, the Shareholders are not liable to indemnify Live until the aggregate amount of all its losses exceeds $240,000, and in that event, the aggregate amount of their liability shall not exceed $2,500,000 (the Indemnity Holdback Amount). *See id*. at § 9.4(a)(i). Live agreed that, following the closing, the indemnification provisions in Article 9

are "its sole and exclusive remedy with respect to any and all claims relating to the subject matter of [the] Agreement[.]"  (*Id*. at § 9.8.[15]).  And, Live knew it was "entitled to deal exclusively with [Milhollan] on all matters relating to [the] Agreement (including with respect to . . . <u>Article 9</u>)[.]" (*Id*. at § 6.10(a)).

Further, the relevant misrepresentations were not, as Live argues, made by Milhollan on behalf of the Shareholders as their appointed representative such that they are subject to liability for fraud and fraudulent inducement.  (Docket No. 56 at 13-16).  As the Shareholders point out, and as the analysis above demonstrates, "Live paid for and received *Precision's* representations in Article 4[.]"  (Docket No. 62 at 5) (emphasis added).  The provisions expressly appointing Milhollan as the Shareholders' Representative make clear that his appointment did not include the power to make material representations on behalf of the individual Shareholders.  *See Agreement* at § 6.10(a) (outlining Milhollan's transactional and executorial powers, *e.g*., to execute and deliver documents, receive funds, and agree to and negotiate claims for indemnification on behalf of the Shareholders).

For all of these reasons, the Court holds that Live has failed to state plausible claims for fraud and fraudulent inducement against the Shareholders.  Accordingly, the Shareholders' Motion to Dismiss Counts I and II of Live's counterclaims will be granted.

### C.  Leave to Amend

The Court's final inquiry is whether the dismissal of Live's counterclaims should be with prejudice or without prejudice and leave to amend.  It is well established that leave to amend may be denied where any amendment would be futile, including if an amended pleading cannot

---

[15]     Live also waived "any and all" claims "arising under or based upon any [l]aw" against Precision and its affiliates for "any breach of any representation, warranty, covenant, agreement or obligation set forth [in the Agreement.]"  (*Agreement* at § 9.8).

withstand a renewed motion to dismiss, *see Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000), or if the claims are barred by the statute of limitations, *see Cowell v. Palmer Twp.*, 263 F.3d 286, 296 (3d Cir. 2001).  As is noted above, Live's fraud and fraudulent inducement counterclaims against the Shareholders are barred by the provisions set forth in the Agreement and cannot be cured by amendment.

The Court further notes that such counterclaims necessarily accrued on the date of the merger, *i.e.*, July 14, 2020, and were not brought in this lawsuit until August 7, 2023, such that they are likely barred by the 2-year statute of limitations under Pennsylvania law, *see*, *e.g.*, 42 Pa. C.S. § 5524(7); *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005), as well as the longer 3-year statute of limitations under Delaware law.  *See*, *e.g.*, 10 Del. C. § 8106; *Winklevoss Cap. Fund, LLC v. Shaw*, No. 2018-0398, 2019 WL 994534, at *5–6 (Del. Ch. Mar. 1, 2019).  It is likewise doubtful that the discovery rule[16] or any other tolling doctrine[17] would save the counterclaims from dismissal given Live's acknowledgements that it had "been permitted full and complete access" to Precision's books and records, facilities, equipment, tax returns, contracts, insurance policies, other properties, and assets that it "desired or requested to see or review[.]"  (*Agreement* at § 5.10).

Given the Court's analysis set forth above, the Court finds that any further amendment of Live's claims would be futile.  In addition, Live has already been afforded an opportunity to amend its counterclaims when the Court struck them from the record and it has not affirmatively sought leave to file a second amended answer and counterclaims, nor provided a proposed pleading such

---

[16]    *See*, *e.g.*, *In re Risperdal Litig.*, 223 A.3d 633, 640 (Pa. 2019) (explaining that Pennsylvania's discovery rule "tolls the statute of limitations when an injury or its cause is not reasonably knowable."); *Morton v. Sky Nails*, 884 A.2d 480, 482 (Del. 2005) (holding that the two requirements for application Delaware's discovery rule are "an inherently unknowable injury and a blamelessly ignorant plaintiff.").

[17]    *See*, *e.g.*, *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 249 (Pa. 2021) (discussing a plaintiff's duty to act with "reasonable diligence."); *Winklevoss Cap.*, 2019 WL 994534, at *6 ("The doctrines of fraudulent concealment, inherently unknowable injuries and equitable tolling will toll the applicable limitations period only when the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.").

that leave to amend may be denied on these grounds as well.  *See U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013).  Therefore, leave to amend will be denied and Live's fraud and fraudulent inducement counterclaims are dismissed, with prejudice.

## VI.    CONCLUSION

Based on the foregoing, the Shareholders' Motion to Dismiss [45] is granted.  Counts I and II of Live's counterclaims and the Shareholders will be dismissed, with prejudice.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated: April 10, 2024
cc/ecf:  All counsel of record